Filed 7/10/15  P. v. Blount CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>TYRIN LEE BLOUNT,<br><br>    Defendant and Appellant. | F066744<br><br>(Super. Ct. No. BF141509B) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>FRANKLIN LAMAR RANDLE et al.,<br><br>    Defendants and Appellants. | F067069<br><br>(Super. Ct. No. BF141509A & C)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENTS]** |

It is ordered that the opinion filed herein on June 18, 2015, be modified as follows:

1.      On page 12, the last sentence of the first full paragraph, beginning with "It is not enough" is deleted, and the cases cited beginning with "(See *Neil v. Biggers, supra,* 409 U.S. at pp. 198-199;" are deleted in their entirety, so that the paragraph reads as follows:

> Our Supreme Court holds a """"single person showup" is not inherently unfair."" (*Ochoa, supra,* 19 Cal.4th at p. 413, quoting *Floyd, supra,* 1 Cal. 3d at p. 714; accord, *Bisogni, supra,* 4 Cal.3d at p. 587.) Such showups are considered unfair when they are not neutral and unnecessarily suggest to the witness in advance the identity of the person suspected by the police. (*People v. Yeoman* (2003) 31 Cal.4th 93, 123-124.) To warrant suppression of a witness's identification of a defendant, the state "must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*Ochoa, supra,* 19 Cal.4th at p. 413.)

2.      In the fourth full paragraph beginning on page 13 and continuing on page 14, the last sentence of the paragraph beginning with "In any event" is deleted, and the case cited "(*Manson v. Brathwaite* (1977) 432 U.S. 98, 116)" is deleted, so that the paragraph reads as follows:

> Here, the police admonished both Andrews and Lopez prior to the showups. Lopez was told that the suspects may or may not be the people who had broken into the residence. Before viewing Randle, both Andrews and Lopez were told that he "may or may not be involved in the crime and it was just as important to protect the innocent as it was to convict the guilty." Andrews was also told the fact the suspects were handcuffed and in police custody should not prejudice her statements. Nothing in this record suggests the officers indicated to Andrews or Lopez that appellants were the perpetrators. In light of the admonitions given, the police procedures used here did not strongly suggest appellants were the perpetrators, as Blount contends. There was not a """"very substantial likelihood of irreparable misidentification."" [Citation.]" (*People v. Arias, supra,* 13 Cal.4th at p. 170.)

3.      On page 15, in the second full paragraph, following the fourth sentence, the case cited "*Manson v. Brathwaite, supra,* 432 U.S. at p. 116" is deleted and the following citation is inserted in its place *Manson v. Brathwaite* (1977) 432 U.S. 98, 116, so that the paragraph reads as follows:

To the contrary, although Andrews and Lopez were certainly under extreme stress during this incident, Andrews viewed appellants' faces when they stood in her home approximately eight feet from her. Other than "shadows" present, neither Andrews nor Lopez expressed much difficulty in seeing the suspects on their porch as they alternately looked through the front windows and the peephole. These showups did not create a very substantial likelihood of irreparable misidentification. Instead, the accuracy of Andrews's and Lopez's identifications was an issue for the jury to weigh. (*Virgil, supra,* 51 Cal.4th at p. 1256; *Manson v. Brathwaite* (1977) 432 U.S. 98, 116.) Under the totality of the circumstances, appellants have not met their burden of demonstrating that the field identification procedures were unreliable and so unfair that it violated due process. (*People v. DeSantis, supra,* 2 Cal.4th at p. 1222.)

4.     On page 16, the heading "**II.  Based On This Record Appellants' Gang Admissions During Various Booking Procedures Did Not Require** *Miranda* **Warnings**" is deleted and the following heading is inserted in in its place:

> **II.     The Admission Of Appellants' Booking Statements Was Not Prejudicial.**

5.     On page 16, following the third full paragraph beginning with "Blount and Jackson contend" and before the subheading "**A. Background**" the following paragraph is inserted:

> In the alternative, Blount asserts his statements during the booking procedures were involuntary, contending the booking staff informed him his answers would not be used against him. He further argues his statements were inadmissible under the principles of estoppel, due process, and the granting of informal use immunity. Finally, he maintains his counsel provided ineffective assistance if we determine these issues were forfeited. Jackson and Randle join in Blount's alternative arguments without providing further legal authority or contentions.

6.     On page 18, the fourth full paragraph beginning with "As an initial matter" is deleted in its entirety and the following paragraph is inserted in its place:

> As an initial matter, there is a dispute between the parties regarding whether or not appellants have waived or forfeited these issues on appeal. We need not analyze this dispute because, when we presume no waiver or forfeiture occurred, appellants' arguments are unpersuasive due to a lack of prejudice.

7.     On page 18, starting with the fifth full paragraph beginning with "Questions during a booking" and concluding after the last full paragraph beginning with "Based on the limited record" on page 22, all paragraphs are deleted in their entirety. The following paragraphs are inserted in their place:

In *People v. Elizalde* (June 25, 2015, S215260) ___ Cal.4th ___ <http://www.courts.ca.gov/opinions.htm> our Supreme Court held that booking questions regarding gang affiliation do not fall under the narrow booking exception to *Miranda*. (*Id.* at pp. 17-19.) Without *Miranda* warnings, a defendant's answers to gang questions posed during a booking procedure are inadmissible in the prosecution's case-in-chief. (*Id.* at p. 21.)

Here, the prosecution introduced at trial appellants' respective unadmonished gang admissions made during various booking procedures. Thus, the Fifth Amendment was violated. (*People v. Elizalde*, *supra*, ___ Cal.4th ___ [pp. 21-22].) Because appellants' various booking statements regarding gang affiliations were inadmissible under *Miranda*, we need not address Blount's alternative arguments that such statements were involuntary and inadmissible under the principles of estoppel, due process, and the granting of informal use immunity.

*Elizalde* held that such erroneous admissions must be reviewed for prejudice under the standard set forth in *Chapman v. California, supra,* 386 U.S. 18. (*People v. Elizalde, supra,* ___ Cal.4th ___ [p. 22].) That standard requires the government "'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]" (*Ibid.*) That burden is satisfied on this record. The appellants' respective gang participation was established beyond their booking statements.

8.     On pages 19, 20, and 22, footnotes 11, 12, 13 and 14 are deleted in their entirety, which will require renumbering of all subsequent footnotes.

9.     On page 23, the subheading "**1.  Appellants cannot establish prejudice**" is deleted in its entirety.

10.     On page 23, the first sentence in the first full paragraph beginning with "Even if the trial court," is deleted, so that the paragraph reads as follows:

In order to prove a defendant "actively participates" in a criminal street gang for conviction under section 186.22, subdivision (a), it is sufficient if the evidence establishes the defendant's involvement with the gang was more than

4.

nominal or passive. (*People v. Castenada* (2000) 23 Cal.4th 743, 747.) A defendant does not have to occupy a leadership position in the gang for conviction. (*Ibid.*) Indeed, a person does not have to be a gang member to be guilty of section 186.22, subdivision (a). (*In re Jose P.* (2003) 106 Cal.App.4th 458, 466.)

11.    On page 25 starting with the heading "**III. The Record Does Not**" and concluding after the last full paragraph beginning with "As discussed in section II" on page 27, all paragraphs and the subheading "**C. Appellants cannot establish prejudice**" are deleted in their entirety.

12.    On page 27, footnotes 22 and 23 are deleted in their entirety, which will require renumbering of all subsequent footnotes.

13.    On page 28, section "**IV.**" is renumbered to **"III."** so the heading reads:

   **III.    The Trial Court's Ex Parte Communication With The Jury Did Not Prejudicially Violate Appellants' Statutory And Constitutional Rights.**

14.    On page 41, section "**V.**" is renumbered to "**IV.**" so the heading reads:

   **IV.    The Trial Court Did Not Prejudicially Err In Declining To Accept Or Requiring The Prosecution To Accept Blount's Proposed Stipulation.**

15.    On page 49, section "**VI.**" is renumbered to "**V.**" so the heading reads:

   **V.    Sufficient Evidence Supports Blount's Conviction Of Count 2.**

16.    On page 51, section "**VII.**" is renumbered to "**VI.**" so the heading reads:

   **VI.    Randle's Gang Admission Was Not Inadmissible Under *Miranda*.**

There is no change in the judgments.

Appellant Clifford Lee Jackson, Jr.'s petition for rehearing filed June 30, 2015, is denied.

Appellant Tyrin Lee Blount's petition for rehearing filed June 30, 2015, is denied.

_____
LEVY, J.

WE CONCUR:


_____
HILL, P.J.


_____
GOMES, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>TYRIN LEE BLOUNT,<br><br>        Defendant and Appellant. | F066744<br><br>(Super. Ct. No. BF141509B) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>FRANKLIN LAMAR RANDLE et al.,<br><br>        Defendants and Appellants. | F067069<br><br>(Super. Ct. No. BF141509A & C)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Peter Dodd, under appointment by the Court of Appeal, for Defendant and Appellant Tyrin Lee Blount.

Geoffrey M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Franklin Lamar Randle.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant Clifford Lee Jackson, Jr.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

On April 10, 2012, three males broke into the residence of Sue Lopez and her adult daughter, Sarah Andrews. Andrews confronted the males inside the home, and they fled. Law enforcement arrived around the same time, and appellants Tyrin Lee Blount, Clifford Jackson, Jr. and Franklin Lamar Randle[1] were discovered and arrested shortly thereafter in the vicinity of the Lopez residence. Appellants were tried together before a jury, and each was found guilty of felony burglary (Pen. Code, § 460, subd. (a)),[2] and promoting felony street gang conduct (§ 186.22, subd. (a)).

On appeal, appellants raise collectively and individually seven issues. First, law enforcement had Lopez and Andrews identify appellants on the morning of their arrests. Appellants contend these field showups were "impermissibly suggestive" and tainted the trial identifications.

---

[1] Blount, Jackson and Randle will be referred to collectively as appellants or else identified individually by name.

[2] All future statutory references are to the Penal Code unless otherwise noted.

2.

Second, during various booking procedures, appellants made respective admissions of gang affiliation (with the Crips and/or the Country Boy Crips), which the prosecution used, in part, to establish appellants were active participants in the Country Boy Crips gang on the day of the Lopez burglary. Appellants argue the trial court erred when it failed to suppress these booking statements under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and its progeny.

Third, appellants assert their booking statements regarding gang affiliations were induced by a promise of leniency from booking personnel, making their statements inadmissible (1) as involuntary, (2) under the principle of "use immunity" and (3) under the doctrine of estoppel.

Fourth, during deliberations, the trial judge had a brief ex parte meeting with the jury to clarify its request for readback of certain testimony. Appellants maintain this contact violated their respective rights to be personally present, and to be represented by counsel, at all critical stages of trial.

Fifth, appellants assert the trial court prejudicially erred when it failed to accept, or require the prosecution to accept, a proposed stipulation from appellants that the Country Boy Crips were a criminal street gang which engaged in criminal behavior pursuant to section 186.22, subdivision (a).

Sixth, Blount contends he was a member of the Watts/Lotus Countryside Boy Crips, and there was insufficient evidence to show that this gang, as opposed to the Country Boy Crips, qualified as a criminal street gang under section 186.22.

Finally, during a street stop not associated with the present charges, Randle made an admission he was a member of the Country Boy Crips. He argues the trial court erred in denying his motion under *Miranda* to suppress this admission.

We find each of these contentions unpersuasive and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**Information**

The Kern County District Attorney's Office filed an amended information charging appellants each with first degree burglary (§ 460, subd. (a); count 1); and promoting felony street gang conduct (§ 186.22, subd. (a); count 2). Jackson was further charged with misdemeanor resisting arrest (§ 148, subd. (a)(1); count 3). As to count 1, it was further alleged as to all appellants that a person other than an accomplice was present during the commission of the burglary (§ 667.5, subd. (c)(21)) and the burglary was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Finally, it was alleged as to counts 1 and 2 that Blount had a prior felony conviction (§ 667, subds. (c)-(j)), which was considered a serious felony (§ 667, subd. (a)), for which Blount served a prior prison term (§ 667.5, subd. (b)).

**Trial evidence**

The April 10, 2012, incident started a little after 9:00 a.m. when a young African-American male approached Lopez's front door, knocked loudly, and repeatedly rang the doorbell. Both Andrews[3] and Lopez looked at him through the door's peephole. After about 30 seconds, the male walked to a gold, mid-sized car parked on the street in front of the Lopez residence. Two other African-American males were in the vehicle and they drove away.

A short time later, a young African-American male jumped over the fence into Lopez's backyard and Lopez called 911. Encountering a dog, the male jumped back over the fence and walked towards a street (Rolling Ridge Drive) behind the Lopez residence.

Through the slats in her backyard fence, Lopez could see the same gold vehicle parked on the street behind her residence. Andrews and Lopez observed three males

---

[3]    In 2011, Andrews was convicted of violating section 488, petty theft, in Humboldt County.

walk toward their residence from Rolling Ridge Drive, and those three males went to their front door and began ringing the doorbell and knocking very loudly. Andrews looked at them through the peephole. Lopez peeked at them from a little side window, which was two or three feet away from them, before moving to the main window, which was approximately seven or eight feet away.

Lopez and Andrews retreated away from the door to hide but, after hearing the front door kicked open, Andrews came out and discovered the three males in her home. She stood about eight feet from them and looked at their faces, according to her estimate, for 10 seconds.

The three males fled through a back sliding glass door into the backyard.[4] It took them approximately 20 seconds to exit the house. Two of the males jumped the backyard fence to the west and the third male jumped the fence to the south.

Bakersfield police arrived at or around the time the males were fleeing. A search commenced and a police officer located Blount walking in a field about a half mile south of the Lopez residence. In his patrol vehicle, the officer approached Blount, who ran. Just before running, Blount was speaking on a cellular phone and the officer, who had his window down, heard him say, "It's over, Cuzz." Blount was apprehended shortly after he ran.

Jackson and Randle were located in the same backyard approximately three or four houses to the west of Lopez's residence. Randle was arrested without incident. Jackson was ordered to show his hands and, when he did not, a police canine was released on him. After the canine engaged Jackson's left shoe, he showed his hands and was arrested.

---

[4] It was stipulated that no fingerprints were located on the rear sliding door of the Lopez residence belonging to either the appellants or any other individual on file.

Later that same morning, the police conducted field identifications, individually showing each of the appellants to Andrews and Lopez. Both Andrews and Lopez identified appellants as the males who broke into their home.

Officers located the gold vehicle parked on Rolling Ridge Drive behind the Lopez residence. Blount's identification was inside the vehicle and he had a key in his possession which operated it.

At trial, Andrews and Lopez could not describe the suspects' facial features on the day of the burglary, but they both described the clothing the suspects wore. Their trial testimony conflicted at times regarding the suspect's clothing and how certain events unfolded on the day in question. At trial, Andrews identified each of the appellants as the males she encountered in her home and she was "sure" of her trial identifications. Andrews also confirmed at trial that appellants were the same individuals she identified on the morning of the burglary.

At trial, Lopez had difficulty identifying the appellants. She testified she never saw the three males inside her home. Through her bedroom window, Lopez saw the three males flee into her backyard and jump over the fence, but she only saw one face for a few seconds.

At trial, both Andrews and Lopez identified a picture of Blount's car as the vehicle they saw outside their residence before the incident.

**Additional witnesses**

Lopez's neighbor, Anthony Rodriguez and his girlfriend, Brittany Cocanower, both observed the same gold vehicle parked in front of Lopez's house on the morning of the incident and they both saw it was occupied by three African-American males. Rodriguez's home was immediately to the west of the Lopez residence.

Rodriguez informed the jury he saw people get out of this vehicle and knock on Lopez's door before returning to the car and driving it around the corner. Three males

6.

then walked to the door and he heard them kick it in. He initially identified the appellants as the three males he saw that morning. However, on cross-examination he admitted he only saw two individuals approach the Lopez residence and he believed it was either Blount or Randle whom he had never seen before. He indicated he initially identified all the appellants in court because they were the people whom police arrested after the incident and because he confirmed it with Cocanower.

At trial, Cocanower identified a photograph of Blount's vehicle as the vehicle she saw in front of the Lopez residence that morning. She informed the jury she saw a male exit this vehicle and approach Lopez's house before returning a minute or two later, and the vehicle drove away. She then heard a lot of noise at the Lopez residence, like someone kicking something, and she saw a male run through her backyard, and believed a second might have been present, but she did not see any faces. She said her memory of that morning was "scrambled" and "hazy." She was not asked to identify appellants in court.

**Gang evidence**

Officer Brian Holcombe of the Bakersfield Police Department testified as the prosecution's gang expert. He discussed the history of the Country Boy Crips, its pattern of criminal activity, and certain predicate offenses its members had committed. Based on a review of tattoos, arrest records, street checks and booking statements, he opined appellants were each active members of the Country Boy Crips as of the date of the Lopez burglary.

**Verdicts and sentencing**

The jury found appellants guilty of count 1, felony burglary (§ 460, subd. (a)), and guilty of count 2, promoting felony street gang conduct (§ 186.22, subd. (a)). The jury found Jackson not guilty of count 3, misdemeanor resisting arrest (§ 148, subd. (a)(1)). The jury found true as to all the appellants that a person other than an accomplice was

7.

present during the commission of the burglary (§ 667.5, subd. (c)(21)) but found not true that the burglary was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

In a bifurcated proceeding, the trial court found true that Blount had suffered a prior conviction within the meaning of the three strikes law (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(f)), that the prior conviction qualified as a prior serious felony (§ 667, subd. (a)), and that Blount had served a prior prison term (§ 667.5, subd. (b)).

Blount was sentenced on count 1 to an aggregate prison term of 17 years. For count 2, Blount was sentenced to an aggregate prison term of 12 years, which the trial court stayed pursuant to section 654.

Randle and Jackson were each sentenced to six years in state prison on count 1. For count 2, Randle and Jackson were each sentenced to three years in state prison, which the trial court stayed pursuant to section 654.

Various fees and fines were imposed on all appellants.

## DISCUSSION

## I.    The Pretrial Identification Procedures Did Not Violate Due Process.

Blount argues the pretrial identification procedures were impermissibly suggestive and tainted the trial identifications. He contends his right to due process was violated, requiring reversal of his convictions. Both Jackson and Randle join in Blount's arguments.

### A.    Background.

Prior to trial, Blount's defense counsel filed motions in limine which included a request to strike the field identifications because they were highly suggestive and without extenuating circumstances. A hearing occurred pursuant to Evidence Code section 402.

## 1. The Evidence Code section 402 hearing.

On the morning of the incident, police officers had Andrews and Lopez separately and individually view the appellants.

Randle was viewed 30 to 40 feet from the Lopez front porch while he stood near a patrol vehicle with an officer present.[5] Prior to the viewing of Randle, Andrews and Lopez were individually told that the subject "may or may not be involved in the crime and it was just as important to protect the innocent as it was to convict the guilty." They were advised to not pay attention to clothing because that could change, but to focus on the subject's facial features and the physical description. Both Andrews and Lopez identified Randle as being involved in the incident.

Andrews and Lopez were each taken in separate patrol vehicles to view the other suspects.[6] The officer with Andrews admonished her the police "had subjects detained, the subjects were in handcuffs, and the fact that we have these subjects detained and that they were in handcuffs was not to prejudice her statements" in any way. Andrews sat in the front passenger seat of a patrol vehicle and separately viewed appellants from approximately 50 feet away. Each of the appellants exited separate patrol vehicles wearing handcuffs, stood in the presence of officers, and were instructed to turn to the right and left. Andrews identified each of the appellants as involved in the incident. After viewing all of the appellants, Andrews said she was 100 percent certain of her identifications that morning.

Lopez separately viewed Blount and Jackson at different locations about 45 minutes after the incident. Prior to the viewings, she was admonished the police had suspects in custody who may or may not be the people who had broken into her

---

[5]  The officer testified at trial she could not recall if Randle wore handcuffs.

[6]  Andrews was shown and identified Randle a second time. It is not clear from the record why Andrews was asked to view Randle more than one time.

9.

residence.  Lopez was advised hairstyles and clothing can change.  She sat in the rear of a patrol vehicle, approximately 60 to 70 feet away, and separately viewed Blount and Jackson, who exited patrol vehicles while handcuffed and in the presence of officers.  After each separate viewing, Lopez indicated they were involved in the incident.

### 2. The trial court's ruling.

At the conclusion of the Evidence Code section 402 hearing, appellants' counsel argued the showups were suggestive because they were duplicated, appellants were needlessly handcuffed and taken from patrol vehicles, and any in-court identifications would be tainted and unreliable.  The trial court denied the in limine motion and ruled the prosecution could present the field showups to the jury, determining they were not unduly suggestive.

### B. Standard of review.

To determine if admission of identification evidence violates due process, an appellate court employs a two-part test.  First, we determine if law enforcement used a procedure that was unduly suggestive and unnecessary.  (*People v. Virgil* (2011) 51 Cal.4th 1210, 1256 (*Virgil*).)  If not, the identification is admissible and the due process inquiry ends.  (*Ibid.*)  Second, if the procedure was unduly suggestive and unnecessary, we determine whether, despite such suggestiveness, the witness's identification of the defendant was reliable under the totality of the circumstances.  (*Ibid.*)  The goal is to prevent "'a very substantial likelihood of irreparable misidentification.' [Citation.]" (*Neil v. Biggers* (1972) 409 U.S. 188, 198.)

The defendant bears the burden of demonstrating the identification procedure was suggestive, unreliable, and so unfair it violated his due process rights.  (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)  The defendant must show "unfairness as a demonstrable reality, not just speculation."  (*Ibid.*)  If the defendant raised and preserved

10.

the issue, we independently review the trial court's ruling a pretrial identification procedure was not unduly suggestive. (*People v. Avila* (2009) 46 Cal.4th 680, 698.)

### C. Analysis.

Blount objects to California law permitting showups, arguing the reasoning is flawed and based on a strained interpretation of the United States Supreme Court authority. He urges this court to join other jurisdictions which have abolished showups based on psychological studies revealing their inherent unreliability.[7] He asserts the showups here were unduly suggestive, unnecessary, and unreliable under the totality of the circumstances. Respondent takes the opposite position.[8]

We will not accept Blount's invitation to abolish showups in light of federal and California law permitting them under a "totality of the circumstances" approach. (*Stovall v. Denno* (1967) 388 U.S. 293, 302 (*Stovall*), overruled on other grounds in *Griffith v. Kentucky* (1987) 479 U.S. 314, 321-322; *People v. Ochoa* (1998) 19 Cal.4th 353, 413 (*Ochoa*); *People v. Clark* (1992) 3 Cal.4th 41, 136; *People v. Floyd* (1970) 1 Cal.3d 694, 714 (*Floyd*), overruled on other grounds in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36; *People v. Bisogni* (1971) 4 Cal.3d 582, 587 (*Bisogni*).)

---

[7] Blount cites *State v. Leclair* (N.H. 1978) 118 N.H. 214; *State v. Dubose* (Wis. 2005) 2005 WI 126; and *State v. Herrera* (N.J. 2006) 187 N.J. 493, along with various articles, to support his policy arguments against one person showups. We note these authorities are not binding on this court. (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 905.)

[8] In a footnote, respondent argues Jackson's and Randle's "cursory joinders" of Blount's arguments are insufficient to establish their individual prejudice. Respondent contends Jackson and Randle cannot satisfy their burden on appeal, citing *People v. Nero* (2010) 181 Cal.App.4th 504, 510, footnote 11. We need not analyze whether Jackson's and Randle's joinders were sufficient to establish their own individual prejudice because, when we presume that Jackson and Randle suffered the same prejudice as argued by Blount, their claims have no merit.

Our Supreme Court holds a "'"single person showup" is not inherently unfair.'" (*Ochoa, supra,* 19 Cal.4th at p. 413, quoting *Floyd, supra,* 1 Cal. 3d at p. 714; accord, *Bisogni, supra,* 4 Cal.3d at p. 587.) Such showups are considered unfair when they are not neutral and unnecessarily suggest to the witness in advance the identity of the person suspected by the police. (*People v. Yeoman* (2003) 31 Cal.4th 93, 123-124.) To warrant suppression of a witness's identification of a defendant, the state "must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*Ochoa, supra,* 19 Cal.4th at p. 413.) It is not enough that a showup was suggestive because suppression will only occur where the suggestiveness was "undue" or excessive. (See *Neil v. Biggers, supra,* 409 U.S. at pp. 198-199; *People v. Kennedy* (2005) 36 Cal.4th 595, 610, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

As discussed below, the showups here did not violate due process.

### 1. The field identifications were neither unduly suggestive nor unnecessary.

Blount contends a single person showup is impermissible absent an exigent circumstance preventing a live lineup and he asserts no such exigency existed here. However, his reliance on *Stovall, supra,* 388 U.S. 293 for this proposition is misplaced as *Stovall* does not hold an exigency, such as a dying eyewitness, is the only circumstance where a single person showup satisfies due process. Instead, the totality of the circumstances are analyzed. (*Id.* at p. 302.)

Single person showups have a valid purpose to exonerate the innocent and aid in discovering the guilty close in time and proximity to the offense. (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 38-39; *People v. Martinez* (1989) 207 Cal.App.3d 1204, 1219.) Field identifications are encouraged because the inherent suggestiveness is offset by the reliability stemming from an immediate determination regarding whether the correct person has been apprehended when events are still fresh in the witness's mind.

(*In re Carlos M.* (1990) 220 Cal.App.3d 372, 387; accord, *People v. Martinez, supra,* 207 Cal.App.3d at p. 1219; *People v. Cowger* (1988) 202 Cal.App.3d 1066, 1071-1072.)

Here, the police conducted the field identifications approximately 45 minutes after the incident. The prompt identifications were likely more accurate than a delayed lineup because the events were still fresh in the witnesses' minds. The field identifications were based on a valid need for law enforcement to discover the correct suspects and exonerate the innocent close in time and proximity to the crime. (*People v. Martinez, supra,* 207 Cal.App.3d at p. 1219.) Blount's arguments that these showups were unnecessary are rejected.

Blount also asserts the identifications were suggestive because he was handcuffed and removed from a police cruiser. However, the presence of handcuffs on a detained suspect is not by itself so unduly suggestive as to taint the identification. (*In re Carlos M., supra,* 220 Cal.App.3d at p. 386.) Likewise, keeping a suspect in a police vehicle during a field identification may be justified by the nature of the circumstances and does not give rise to a substantial likelihood of misidentification. (*People v. Craig* (1978) 86 Cal.App.3d 905, 914.)

Finally, courts have considered the admonitions given to witnesses in determining whether an unduly suggestive procedure occurred. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 990 [witness "was not to assume the person who committed the crime was pictured therein, that it was equally important to exonerate the innocent, and that he had no obligation to identify anyone"]; *People v. Arias* (1996) 13 Cal.4th 92, 169 [officer's statement to witness "the suspect 'might be in here, he might not'" was considered]; *In re Carlos M., supra,* 220 Cal.App.3d at p. 386 [nothing in record indicates police said anything to victim to suggest people she would be viewing were in fact her attackers].)

Here, the police admonished both Andrews and Lopez prior to the showups. Lopez was told that the suspects may or may not be the people who had broken into the

residence. Before viewing Randle, both Andrews and Lopez were told that he "may or may not be involved in the crime and it was just as important to protect the innocent as it was to convict the guilty." Andrews was also told the fact the suspects were handcuffed and in police custody should not prejudice her statements. Nothing in this record suggests the officers indicated to Andrews or Lopez that appellants were the perpetrators. In light of the admonitions given, the police procedures used here did not strongly suggest appellants were the perpetrators, as Blount contends. There was not a "'"very substantial likelihood of irreparable misidentification."'" [Citation.]" (*People v. Arias, supra,* 13 Cal.4th at p. 170.) In any event, any untrustworthiness in the identification process was an issue for the jury to weigh. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 116.)

Under the totality of the circumstances, appellants' showups were neither unduly suggestive nor unnecessary.

### 2. The field identifications were reliable.

Even if appellants' field showups were unduly suggestive and unnecessary, the identifications were nevertheless admissible as reliable under the totality of the circumstances. (*Virgil, supra,* 51 Cal.4th at p. 1256.) To determine reliability, an appellate court takes into account such factors as "'the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.' [Citations.]" (*Ibid.*)

Here, both witnesses had multiple opportunities to view appellants at the time of the offense, both before appellants entered the house and as they fled. Andrews was 100 percent certain in her field identifications, and neither she nor Lopez expressed any doubt

when identifying each suspect individually in the field. The field identifications occurred when Andrews's and Lopez's memories were still fresh.

Blount's arguments are unpersuasive that Andrews and Lopez did not have significant time to observe appellants or that the field identifications were not very certain. We also do not agree with Blount's contentions that Andrews and Lopez did not have a very "advantageous point" to view the suspects, they were under stress so their attention was questionable, and they could only identify appellants based on clothing and not facial features.

To the contrary, although Andrews and Lopez were certainly under extreme stress during this incident, Andrews viewed appellants' faces when they stood in her home approximately eight feet from her. Other than "shadows" present, neither Andrews nor Lopez expressed much difficulty in seeing the suspects on their porch as they alternately looked through the front windows and the peephole. These showups did not create a very substantial likelihood of irreparable misidentification. Instead, the accuracy of Andrews's and Lopez's identifications was an issue for the jury to weigh. (*Virgil, supra,* 51 Cal.4th at p. 1256; *Manson v. Brathwaite, supra,* 432 U.S. at p. 116.) Under the totality of the circumstances, appellants have not met their burden of demonstrating that the field identification procedures were unreliable and so unfair that it violated due process. (*People v. DeSantis, supra,* 2 Cal.4th at p. 1222.)

### 3. Appellants cannot establish prejudice.

Even if the trial court erred in failing to suppress the field identifications, the error was not prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 24. At trial, Andrews identified the appellants as the three males whom she confronted in her home, and she was sure of her trial identifications. Given the multiple opportunities Andrews had to view the appellants, including their faces, her trial identifications were not tainted by the field showups. (*Simmons v. United States* (1968) 390 U.S. 377, 384.)

15.

Moreover, Blount's vehicle was identified outside the Lopez residence with three African-American males inside just before the burglary. Blount was arrested in a vacant field about a half mile from the Lopez residence after the burglary. Before running from law enforcement, Blount said into his cellular phone, "It's over, Cuzz."

Despite Blount's arguments to the contrary, this was not a close case or a case of mistaken identity due to the evidence linking Blount to the crime scene, the three males observed in Blount's vehicle just before the crime, the location of appellants when apprehended just after the crime, and Andrews's unequivocal trial identifications. It is beyond a reasonable doubt any error was harmless.

## II. Based On This Record Appellants' Gang Admissions During Various Booking Procedures Did Not Require *Miranda* Warnings.

Blount and Jackson contend the trial court erred by denying a defense motion to suppress gang admissions they each made during various booking procedures. Both argue the booking questions were not routine and amounted to a custodial interrogation requiring suppression under *Miranda* and its progeny. They further contend their respective trial counsel rendered ineffective assistance if it is determined this issue was forfeited on appeal. Randle does not provide any argument or legal authorities regarding these contentions but joins in Blount's and Jackson's claims.

### A. Background.

Prior to trial, appellants each filed motions in limine to exclude confessions or admissions they made without prior *Miranda* warnings. A hearing pursuant to Evidence Code section 402 occurred.

#### 1. The Evidence Code section 402 hearing.

The prosecution's gang expert Holcombe, testified he reviewed various arrest reports, street checks and booking reports regarding appellants. Appellants each made

16.

respective gang admissions during different booking procedures. Appellants' defense counsel did not object to this testimony under *Miranda*.

During cross-examination from Randle's defense counsel, Holcombe clarified he was not present during Randle's booking procedures, did not speak with the booking officers, but knew the typical booking questions.[9] Holcombe explained the booking officer would typically ask: "Do you belong to or associate with any gang in or around the jail? If yes, which one? Which clique or set?" The suspects are also asked: "Is there any group or person you should be kept away from? If yes, who?"

The trial court granted Jackson's and Randle's motions in limine regarding admissions made in connection to the present offense, but denied the motions as to any admissions occurring prior to the present offense.[10]

### 2. The trial testimony.

During trial, Holcombe testified he reviewed booking records for the appellants and found two significant records for each of the appellants. In Blount's booking records, he identified himself with the Crips and a "keep-away" from the Bloods. In Jackson's booking records, he identified association or belonging to the Country Boy Crips. In Randle's booking records, he identified preference for the Crips, specifically the Country Boys, and a "keep-away" from the Bloods. Based, in part, on his review of the booking information, Holcombe opined appellants were active members of the Country Boy Crips on the day of the Lopez burglary.

---

[9]     During the Evidence Code section 402 hearing, Holcombe was not asked if he was present during either Blount's or Jackson's various booking procedures.

[10]     In light of the trial court's ruling, Blount withdrew his motion in limine on this issue.

During cross-examination by Blount's defense counsel, Holcombe confirmed that booking questions were given for the safety of the facilities, and suspects were asked if they needed to be kept away from somebody.

## B.     Standard of review.

Under the requirements set forth in *Miranda*, a person may not undergo "custodial interrogation" unless that person knowingly and intelligently waives the right to remain silent, the right to presence of legal counsel, and the right to appointed counsel if the person is indigent.  (*People v. Sims* (1993) 5 Cal.4th 405, 440, citing *Miranda, supra,* 384 U.S. at pp. 444-445.)  However, *Miranda* does not pertain to a "'routine booking question'" that secures the "'biographical data necessary to complete booking or pretrial services.'"  (*Pennsylvania v. Muniz* (1990) 496 U.S. 582, 601 (*Muniz*).)

*Muniz* recognizes that questions which are reasonably related to law enforcement's administrative concerns do not require *Miranda* warnings.  (*Muniz, supra,* 496 U.S. at pp. 601-602.)  *Muniz*, however, cautioned this exception does not apply to all questions asked during the booking process; instead, a *Miranda* waiver is still required for any questions, even during booking, which "'are designed to elicit incriminatory admissions.' [Citations.]"  (*Id.* at p. 602, fn. 14.)

## C.     Analysis.

As an initial matter, there is a dispute between the parties regarding whether or not appellants have waived or forfeited this issue on appeal, and the issues discussed in section III, *post*.  We need not analyze this dispute because, when we presume no waiver or forfeiture occurred, appellants' arguments are unpersuasive on the merits.

Questions during a booking procedure about a suspect's gang affiliation can fall under the "booking question exception" if a careful scrutiny of the record demonstrates the questions were not designed to elicit an incriminating response.  (*People v. Gomez*

(2011) 192 Cal.App.4th 609, 635 (*Gomez*).)[11]  In *Gomez*, the defendant was charged with carjacking, robbery, assault with a deadly weapon, and active participation in a criminal street gang.  (*Id.* at p. 613.)  It was alleged the defendant committed the offenses for the benefit of or in association with a criminal street gang.  A jury convicted the defendant of the carjacking count, simple assault, and active participation in a criminal street gang, and found true the allegations the crimes were committed for the benefit of a criminal street gang.  (*Ibid.*)  During his booking, the defendant was asked about gang affiliation, and his response showed a gang affiliation.  (*Id.* at p. 615.)  The trial court allowed the prosecution's gang expert to testify about the defendant's statements during the booking interview. (*Id.* at p. 627.)

The *Gomez* court held the booking questions were admissible and no error occurred in its admission.  (*Gomez, supra,* 192 Cal.App.4th at p. 627.)  "In determining whether a question is within the booking question exception, courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information.  [Citation.]"  (*Id.* at p. 630.)

In reaching its conclusion, *Gomez* noted the following criteria which courts have used to review this issue: (1) the nature of the questions, such as whether they seek identifying data necessary for booking; (2) the interrogation's context, including whether the questions were asked during a clerical booking process that was noninvestigative, and pursuant to a standard booking form or questionnaire; (3) the government agent's knowledge and intent when asking the questions; (4) the relationship between the defendant's suspected crime and the questions asked; (5) the administrative need for the information sought; and (6) any other indications that the questions were intended, at

---

[11]    On May 18, 2011 (S191621), the Supreme Court denied review of *Gomez*.

least in part, to elicit incriminating evidence and merely asked under a guise or pretext of seeking routine biographical information.[12] (*Gomez, supra,* 192 Cal.App.4th at pp. 630-631.)

The *Gomez* court noted the booking officer was not involved in the investigation or arrests of the crimes, it was a legitimate booking context, and the booking questions were from a standard booking form. (*Gomez, supra,* 192 Cal.App.4th at p. 635.) *Gomez* determined the questions were asked "for legitimate, noninvestigatory purposes related to the administration of the jail and concerns for the security of the inmates and staff." (*Ibid.*) The *Gomez* court focused on the lack of evidence showing the booking officer knew why the defendant was arrested or the nature of the suspected crimes. (*Ibid.*) The booking interview occurred on the same day as the defendant's arrest, two days before he was formally charged, and the record did not disclose the booking officer knew this was a gang-related crime.[13] (*Gomez, supra,* 192 Cal.App.4th at p. 635.)

---

[12] Our Supreme Court cited *Gomez* with approval for this approach in examining whether *Miranda* was required during a prison intake interview in which the defendant made an admission of murder after asking to be housed separately over fear of reprisal from the victim's relative. (*People v. Williams* (2013) 56 Cal.4th 165, 187-188.)

[13] *Gomez* was decided by the Fourth District Court of Appeal, Division Two. On November 19, 2013, the First District Court of Appeal, Division Two, took issue with *Gomez* and determined it is unlikely a booking officer would not be aware of the possibility a defendant might be a gang member when asking booking questions regarding gang affiliation. (*People v. Elizalde* (2013) 222 Cal.App.4th 351, 378 (*Elizalde*).) The *Elizalde* court was unaware of any other case "involving the routine booking exception where the defendant was asked to choose between incriminating himself or risking serious physical injury." (*Id.* at p. 381.) *Elizalde* held booking questions regarding gang affiliation could not be used against a defendant at trial in the absence of *Miranda* warnings. (*Ibid.*)

On April 9, 2014, our Supreme Court granted review of *Elizalde*, rendering it not citable as superseded by grant of review. (*People v. Elizalde* (April 9, 2014, S215260) __ Cal.4th __ [2014 Cal.LEXIS 2769].) The Supreme Court ordered the parties in *Elizalde* to brief and argue the following limited issues: "Was defendant subjected to custodial interrogation without the benefit of warnings under *Miranda v. Arizona* (1966) 384 U.S.

Here, appellants do not cite to the record, and we have not found, what questions were actually posed to appellants regarding their gang affiliations during the various booking procedures. Instead, the only booking questions brought out in this record occurred during the Evidence Code section 402 hearing when Holcombe testified he was not present during Randle's booking process, did not speak with the booking officer, but knew the typical booking questions. There is a lack of evidence in this record establishing the booking officers (for both the present and past charges) had knowledge of the crimes for which appellants were suspected of committing. This record does not demonstrate the booking officers were involved with appellants' investigations or arrests. The booking questions which Holcombe summarized during the Evidence Code section 402 hearing appear legitimate and intended for noninvestigatory purposes related to the administration of the jail and concerns for the security of the inmates and staff. (*Gomez, supra,* 192 Cal.App.4th at p. 635.) Indeed, during trial, Holcombe confirmed the suspects were asked if they needed to be kept away from somebody, which was done for the safety of the facilities. Blount's and Randle's booking statements for the present offense occurred on the same day as their arrest, which was two days before they were formally charged. Like in *Gomez,* this record does not demonstrate the booking questions were designed to elicit incriminating information. (*Ibid.*)

Blount cites to this court's decision in *People v. Morris* (1987) 192 Cal.App.3d 380 (*Morris*) to establish his admissions should have been suppressed. His reliance is misplaced. *Morris* concluded that while the police may ask whatever questions are required for jail security, if the inquiries are reasonably likely to yield an incriminating

436 when he was questioned about his gang affiliation during an interview while being booked into jail, or did the questioning fall within the booking exception to *Miranda*? If the questioning fell outside the booking exception, was defendant prejudiced by the admission of his incriminating statements at trial?" (*Ibid.*) As of the date of our present opinion, the Supreme Court has not issued an opinion in *Elizalde*.

21.

response, the suspect's responses are not admissible at trial unless they were preceded by *Miranda* warnings. (*Id.* at pp. 389–390.)  However, in the same opinion that approved of the criteria which *Gomez* employed, the Supreme Court questioned the reasoning in *Morris*, noting the "booking exception" had become well established since *Morris* was decided.  (*People v. Williams, supra,* 56 Cal.4th at p. 187.)

Blount also contends allowing booking questions about gang affiliation absent *Miranda* warnings would "fly in the face" of *Muniz*, which allows a "'routine booking'" exception only for questions related to "biographical data necessary to complete booking or pretrial services."  (*Muniz, supra,* 496 U.S. at p. 601.)  This incorrectly states the law because the *Muniz* plurality indicated the booking exception applies not only to biographical date, but broadly to questions "reasonably related to the police's administrative concerns."  (*Muniz, supra,* 496 U.S. at pp. 601-602, fn. omitted (plur. opn. of Brennan, J.); see also *People v. Rucker* (1980) 26 Cal.3d 368, 387 [booking information is required for internal jail administration], superseded by statute as stated in *Gomez, supra,* 192 Cal.App.4th at p. 630, fn. 11.)  It is a legitimate administrative concern to classify inmates by gang affiliation.  (*Gomez, supra,* 192 Cal.App.4th at p. 634; see also *Harbin-Bey v. Rutter* (6th Cir. 2005) 420 F.3d 571, 576; *Morris, supra*, 192 Cal.App.3d at pp. 389–390.)

Based on the limited record regarding this issue, appellants were not subject to booking questions designed to elicit incriminating responses.  Accordingly, the various booking responses regarding gang affiliations were admissible notwithstanding the absence of *Miranda* warnings.[14]  (*Gomez, supra,* 192 Cal.App.4th at p. 635.)

---

**14**    Because appellants could not suppress this evidence under *Miranda*, appellants cannot establish their trial counsel were constitutionally ineffective in not seeking exclusion under *Miranda*.  (See *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1024 [defense counsel not required to make futile motions or indulge in idle acts to appear

### 1.    Appellants cannot establish prejudice.

Even if the trial court erred in admitting appellants' respective booking admissions, appellants cannot establish prejudice. In order to prove a defendant "actively participates" in a criminal street gang for conviction under section 186.22, subdivision (a), it is sufficient if the evidence establishes the defendant's involvement with the gang was more than nominal or passive. (*People v. Castenada* (2000) 23 Cal.4th 743, 747.) A defendant does not have to occupy a leadership position in the gang for conviction. (*Ibid.*) Indeed, a person does not have to be a gang member to be guilty of section 186.22, subdivision (a). (*In re Jose P.* (2003) 106 Cal.App.4th 458, 466.)

### a.    Trial evidence regarding Blount's gang participation.

Blount wore a "Country Boy" tattoo across his chest, along with a "W" and "Watts" on his right shoulder and an "L" and "Lotus" on his left shoulder.[15] Another gang member identified Blount as a member of the Country Boy Crips, and Blount had multiple arrests and encounters with law enforcement while in the company of other known gang members. Blount had at least two previous arrests for residential burglary, which Holcombe noted was a primary criminal activity of the gang. Blount was previously arrested for possession of a loaded firearm, which Holcombe explained was used by gang members for protection and to increase status. Blount's home was searched, revealing a single live .40-caliber round of ammunition and powered blue clothing, the primary color of the Country Boy Crips.

---

competent].) Thus, we will not address appellants' arguments their defense counsel rendered ineffective assistance in this regard.

[15]    The jury was shown photographs of Blount's tattoos.

### b. Trial evidence regarding Jackson's gang participation.

Jackson was documented multiple times with known Country Boy Crip gang members, including at two commercial establishments that are known gang hangouts.[16] During one contact with law enforcement, Jackson stated the East Side Crips were not allowed to attend a particular business and the Country Boy Crips could not go into a particular East Side hangout. He discussed with law enforcement how guns are disposed in the gang culture. During a different encounter, Jackson informed an officer he "hangs out" with Country Boy Crip gang members. Jackson was shot at an event which included Country Boy Crips and a rival gang.[17] On July 15, 2010, he was arrested, and eventually pled guilty, for a residential burglary he conducted with a known associate of the Country Boy Crips.[18] On July 25, 2010, he was arrested for residential burglary and eventually convicted for possession of stolen property after he was identified through his moniker, Buddha.[19]

### c. Trial evidence regarding Randle's gang participation.

Randle informed law enforcement on three different occasions he was a member of the Country Boy Crips. Randle was repeatedly documented in association with known Country Boy Crip members, including at known Country Boy Crip hangouts. During one

---

[16] Along with known gang members, the mother of Jackson's child was with him at one of the commercial establishments, a market.

[17] On cross-examination, Holcombe agreed law enforcement had not ascertained a connection between Jackson and the unidentified shooters, and other victims at the event were not gang members.

[18] Three females were also arrested in connection with this burglary and Holcombe admitted on cross-examination no investigation was done to determine their association with the Country Boy Crips other than that offense.

[19] At trial, Jackson's aunt testified that this nickname was given to him by his father. Holcombe testified a street moniker often started as a family nickname, but he admitted on cross-examination he had never asked other Country Boy Crip gang members about the moniker "Buddha."

occasion when Randle was with known Country Boy Crip gang members, officers located a firearm which Randle admitted was his, and which Holcome analyzed as a predicate offense for the gang. During a different contact with officers, Randle explained the significance of wearing gang colors and how that trend has changed.

Therefore, apart from the booking admissions, the evidence clearly established appellants' active participation with the Country Boy Crips, which was more than passive or nominal.[20] Thus, there was substantial evidence to prove a violation of section 186.22, subdivision (a), as to appellants. This conclusion is not altered because the jury did not find true the gang enhancement under section 186.22, subdivision (b).[21] This conclusion is also not affected by the length of the jury's deliberations, which Blount argues shows this was a close case. It is beyond a reasonable doubt the admission of appellants' various booking statements was harmless. (*People v. Sims, supra,* 5 Cal.4th at p. 447 [harmless-error standard of *Chapman* used to analyze the prejudicial effect of a defendant's erroneous admission].)

## III. The Record Does Not Establish Appellants' Booking Statements Were Involuntary.

Blount asserts his statements during the booking procedures were involuntary, contending the booking staff informed him his answers would not be used against him. He further argues his statements were inadmissible under the principles of estoppel, due process, and the granting of informal use immunity. Finally, he maintains his counsel

---

[20] Jackson's specific arguments are unpersuasive that, apart from the booking admissions, the evidence of his active gang participation was disputed. Jackson was documented multiple times with known Country Boy Crip gang members, and he made statements to law enforcement establishing his affiliation with the gang, and his understanding of their boundaries and culture.

[21] Section 186.22, subdivision (b), requires a showing of "specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1); *People v. Romero* (2006) 140 Cal.App.4th 15, 19.)

provided ineffective assistance if we determine these issues were forfeited. Jackson and Randle join in Blount's arguments without providing further legal authority or contentions.

### A.    Background.

At trial, Blount's defense counsel cross-examined Holcombe regarding the booking process, and the following exchange occurred:

> "Q.    So in the context of all of those questions, they also ask them about the gangs, if they have any -- and they don't ask you, for example, if you grew up in a neighborhood that was linked to any gangs; correct?
>
> "A.    Right.  It is not an investigation.  It is just a booking question.
>
> "Q.    And they are told it is never going to be used against them. Otherwise, they would give them *Miranda* rights; right?
>
> "A.    Right.  It is not an investigation."

### B.    Appellants fail to establish a promise was made to them.

Blount contends he did not knowingly waive his *Miranda* rights because the booking officer offered him "a false promise" which induced him "to give up his constitutional right to remain silent."  He asserts the booking officer "was charged with the constitutional mandate of accurately informing [him] that he had [the] right to remain silent and anything he said would be used against him."  He maintains his booking statements were "involuntary" following the booking officer's "assurance" that nothing he said would be used against him.

However, as discussed in section II, *ante*, this record does not establish *Miranda* rights were triggered from these booking questions.  (*Gomez, supra,* 192 Cal.App.4th at p. 635.)  Further, Blount provides no citation to the record demonstrating any "assurance" made by any booking personnel during the bookings Holcombe reviewed.  No booking officers testified at trial.  Instead, Blount's arguments are based on Holcombe's testimony, but there is no evidence Holcombe was present for any of appellants'

respective bookings. During the Evidence Code section 402 hearing, Holcombe testified he was not present when Randle went through his booking process. Holcombe's trial testimony did not establish a particular custom or practice by booking personnel regarding assurances given during the booking procedure. (Evid. Code, § 1105 ["admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom"].) The record does not support Blount's assertions the booking officers actually deceived or "misadvised" him.[22]

Because this record lacks such evidence, a due process violation has not been established. (*People v. Neal* (2003) 31 Cal.4th 63, 79 [a statement is involuntary and violates due process if it was obtained by threats or promises, either directly or indirectly.) Likewise, estoppel requires a showing that a party has "intentionally and deliberately" led another to believe a particular thing is true and to act upon that belief. (Evid. Code, § 623.) No such showing has been made on this record. Finally, because this record lacks a showing of any actual or implied promise made to any of the appellants, they cannot establish the granting of immunity.

## C. Appellants cannot establish prejudice.

As discussed in section II, *ante*, even if it was error to admit appellants' various booking statements, they cannot establish prejudice. It is beyond a reasonable doubt the admission of the booking statements was harmless error.[23] (*People v. Sims, supra,* 5 Cal.4th at p. 447.)

---

**22** Because the record fails to establish appellants were actually deceived or misadvised, we will not address the parties' dispute regarding whether the question posed to Holcombe was ambiguous as compound or whether that issue was waived due to the prosecution's failure to object at trial.

**23** Because appellants could not suppress this evidence under *Miranda*, appellants cannot establish that their respective trial counsel were constitutionally ineffective in not seeking exclusion under *Miranda*. (See *People v. Scheer, supra,* 68 Cal.App.4th at p. 1024 [defense counsel not required to make futile motions or indulge in idle acts to

27.

**IV. The Trial Court's Ex Parte Communication With The Jury Did Not Prejudicially Violate Appellants' Statutory And Constitutional Rights.**

Blount and Randle assert the trial court's ex parte communication with the jury during deliberations prejudicially violated the Sixth and Fourteenth Amendments as it deprived them of the right to be personally present, and to be represented by counsel, at all critical stages of trial. Jackson adopts Randle's arguments but provides his own analysis regarding prejudice.

**A.  Background.**

On January 9, 2013, upon the jury's release to begin deliberations, the trial court notified the parties that they would be informed if the jury submitted a note. Two days later, on Friday, January 11, 2013, the trial court received a note from the jury. The note read: "Need testimony between Off. Holcombe and D.A. [prosecutor]. Also need explanation from Judge Lua on Count #2 in regards to Jury Instructions."

At 10:25 a.m. that same morning, the court clerk notified counsel of the jury's note regarding both the question and the request for readback, and counsel agreed to the court responding in writing.

At some point that same morning, the trial judge entered the jury deliberation room and spoke with the jury on the record without any of the appellants or their respective counsel present. The judge indicated he needed clarification to respond to the jury's note and asked if they wanted readback of Holcombe's testimony when he was initially questioned by the prosecutor or every time the prosecutor questioned Holcombe. An unidentified juror responded and the following exchange occurred:

---

appear competent].) Further, because any error was harmless, appellants cannot establish prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [the defendant has burden of showing both deficient performance and resulting prejudice].) Thus, we will not analyze further appellants' arguments their defense counsel rendered ineffective assistance in this regard.

"THE JUROR:  What we are trying to establish is the dates and times of the conviction.

"THE COURT:  I just want to know if it's the initial direct examination or is it also redirect examination?

"THE JUROR:  Redirect examination, also.  Yes.

"THE COURT:  Okay.  In a moment my reporter will begin reading the testimony that you have requested, including direct examination and redirect examination when necessary.  While she is reading the examination to you or the testimony to you, you cannot interrupt her, nor can you ask her any questions such as can you please repeat what you just stated, start over, or go to a different area.  She can only read it one time from beginning to end, and she will cover those areas that are expressly stated in the note received.  If you want her to repeat any portions or address different witnesses, you must accompany that with another note that we will then accomplish for you.  While she is in the jury deliberation room, you cannot deliberate in her presence either.  So you cannot discuss anything about the case or ask her any questions or any other people any questions.

"Once she is done, she will gather her equipment and leave the jury deliberation room, and then you can resume jury deliberations.

"The note received also had another question to it or request to it.  I have answered that on this paper, and I will leave it with you folks to review.  You can read it and review it after my reporter leaves.

"Okay.  Good luck.

"THE JUROR:  Thank you."

The judge's written answer to the jury's note read: "Please refer to CALCRIM [No.] 1400 and its accompanying instructions – Judge Lua."

After the weekend break, the jury indicated it had reached a verdict on Monday, January 14, 2013, as of 9:16 a.m.  Prior to bringing the jury into the courtroom, the trial court memorialized what occurred on January 11, 2013, regarding the jury's note.  The trial judge noted that each person, or their representative, had been contacted regarding the note and explained that he wrote an answer to the jury, and he read his answer

verbatim in court. The court also explained that he went into the jury room to admonish the jury about the readback procedure, and he noted that the readback process took a while to complete, with deliberations resuming "around 2:30 that afternoon, if not 2:45."

Randle's defense counsel requested a mistrial because the trial court entered the jury room without asking the attorneys for their agreement. Randle's counsel argued that the court's actions were improper "and may have violated my client's Sixth and Fourteenth Amendment right to a fair trial." The court denied the motion without comment.

### B. Standard of review.

#### 1. The trial court's communication with the jury.

A trial court should not communicate with the jury except in open court and with prior notification to counsel. (*People v. Clark* (2011) 52 Cal.4th 856, 987 (*Clark*); *People v. Jennings* (1991) 53 Cal.3d 334, 384 (*Jennings*).) "'"This rule is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case."' [Citations.]" (*Jennings, supra,* 53 Cal.3d at p. 384.)

Ex parte communication between the judge and jurors typically violates a defendant's right to be present, and represented, at all critical stages of trial. (*Clark, supra,* 52 Cal.4th at p. 987.) If the trial court has an improper ex parte communication with the jury, reversal is required unless the error was harmless beyond a reasonable doubt. (*Ibid.*; *Jennings, supra,* 53 Cal.3d at pp. 383-384.)

#### 2. Section 1138.

Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.

Upon being brought into court, the information required must be given in the presence of, *or after notice to*, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (Italics added.)

Section 1138 requires notice to be given to the defendant and his counsel of any proceedings during the deliberative process. (*People v. Garcia* (2005) 36 Cal.4th 777, 802 (*Garcia*); *People v. Jenkins* (2000) 22 Cal.4th 900, 1027 (*Jenkins*).) This ensures that counsel has the opportunity to suggest an alternative course for the trial court to take or to object to the court's course of action. (*Garcia, supra,* 36 Cal.4th at p. 802; *Jenkins, supra,* 22 Cal.4th at p. 1027.)

A trial court is required to instruct a deliberating jury regarding any point of law in the case if the jury so requests. (*People v. Waidla* (2000) 22 Cal.4th 690, 746 (*Waidla*).) The trial court has a primary duty to assist the jury in understanding the legal principles it is asked to apply. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*).) The court, however, is not required to elaborate on the standard jury instructions if the original instructions are full and complete. (*Ibid.*) In such a situation, the trial court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for additional information. (*Ibid.*) As our Supreme Court has noted, it is often risky for a trial court to offer comments that diverge from the standard instructions. (*Ibid.*) "'When a question shows the jury has focused on a particular issue, or is leaning in a certain direction, the court must not appear to be an advocate, either endorsing or redirecting the jury's inclination.' [Citation.]" (*People v. Montero* (2007) 155 Cal.App.4th 1170, 1180 (*Montero*).)

"An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*Waidla, supra,* 22 Cal.4th at pp. 745-746.)

31.

## C.    Analysis.

As an initial matter, respondent does not contend appellants have waived or forfeited any claim of error due to the trial court's presence in the jury deliberation room. However, there is a dispute between the parties regarding whether or not appellants have waived or forfeited any claim of error as to the trial court's written response to the jury or the request for readback of testimony. We need not analyze this dispute because, when we presume no waiver or forfeiture occurred, appellants' arguments are unpersuasive on the merits.

### 1.    The trial court did not err regarding the readback of testimony.

Randle initially argues the trial court erred by giving the jury readback of critical testimony without giving him and his attorney notice and an opportunity to respond to the court's "intentions" or its "proposed action." He claims the trial court failed to "properly" notify him and his counsel before taking action, which prevented his counsel from having input. He also contends the jury's request for readback was ambiguous, and the trial court "unfairly" emphasized the prosecution's case by not suggesting cross-examination and only presenting a "limited choice" regarding what testimony it could hear.

These contentions, however, are unpersuasive because the court's clerk contacted all counsel regarding the note. The jury's note stated it needed testimony "between" Holcombe and the prosecutor. Upon notice of the jury's note, counsel had the right to participate, object, or provide input regarding the scope of readback. (*Garcia, supra,* 36 Cal.4th at p. 802; *Jenkins, supra,* 22 Cal.4th at p. 1027.) Nothing in this record demonstrates any of the counsel objected to readback of testimony "between" Holcombe and the prosecutor, suggested an alternative course for the trial court to take, or requested that Holcombe's testimony on cross-examination also be read to the jury. When the trial

court reconvened with the parties, no counsel objected that they did not receive notice of the jury's request for readback.

Moreover, under section 1138, a trial court must generally allow the rereading of relevant testimony as requested by the jury. (*People v. Cooks* (1983) 141 Cal.App.3d 224, 261.) The determination of what testimony satisfies the jury's request is a matter within the sound discretion of the court. (*Id.* at p. 261.) A trial judge does not have to order readback of testimony which the jury did not request. (*People v. Gordon* (1963) 222 Cal.App.2d 687, 689.)

Here, the jury's request for readback was specific and not ambiguous despite Randle's contentions to the contrary. In responding to the jury's request, the trial court did not "unfairly" emphasize the prosecution's case or give the jury only a "limited choice" regarding what testimony it could hear. Instead, the trial court invited the jury to submit further requests for any additional testimony it wanted. The jury certainly would have asked for more testimony if the information provided was not satisfactory. (*People v. Gordon, supra,* 222 Cal.App.2d at p. 689.)

Further, the trial court properly refrained from interrogating the jury about either their motives behind the request or what particular "point" they wanted, as Randle contends should have occurred. Our Supreme Court has emphasized a trial court should refrain from interrogating a deliberating jury in case it inadvertently coerces a particular verdict. (*People v. Roldan* (2005) 35 Cal.4th 646, 730, disapproved in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Randle relies on *People v. Bradford* (2007) 154 Cal.App.4th 1390 (*Bradford*); *People v. Dagnino* (1978) 80 Cal.App.3d 981 (*Dagnino*); and *People v. Knighten* (1980) 105 Cal.App.3d 128 (*Knighten*), to support his contention the trial court erred. These authorities are unpersuasive.

33.

In *Bradford*, the trial judge spoke with the deliberating jury on four separate occasions, unaccompanied by counsel and with no court reporter. (*Bradford, supra,* 154 Cal.App.4th at p. 1413.) Prior to each visit, the judge conferred with counsel regarding the particular issues. (*Id.* at pp. 1400, 1403-1405, 1407.) However, during his visits, the judge was present with the jury while it deliberated, offered further instructions to the jury, responded to the juror's questions, and, on at least one occasion, observed the jury alter what they had written on a dry erase board summarizing their understanding of the applicable law. (*Id.* at p. 1414.) *Bradford* held the defendant should have been given "'''an adequate opportunity''''' to evaluate the propriety of the proposed judicial responses in order to raise objections or suggest a different reply more favorable to the defense. (*Id.* at p. 1413.) The trial court erred when it failed to give notice or afford the defense an opportunity to respond to the jury's inquires, which deprived the defendant of an opportunity for his attorney to have meaningful input into the court's responses. (*Ibid.*)

In *Dagnino, supra,* 80 Cal.App.3d 981, the trial court responded to three written jury requests for further legal clarification. The trial court notified counsel and received permission to respond to the first note, but the trial court responded to the two subsequent notes without notifying counsel. (*Id.* at p. 984.) The *Dagnino* court found reversible error because the trial court's instructions constituted a "'critical'" stage that occurred without the presence of counsel and absent a stipulation. (*Id.* at p. 988.)

Finally, in *Knighten, supra,* 105 Cal.App.3d 128, the trial court entered the jury room during deliberations ostensibly to clarify a request from the jury for rereading of certain testimony. (*Id.* at p. 132.) Before meeting with the jury, the trial judge failed to give notice to the defendant and defense counsel, who, along with the court reporter, were not present for the judge's meeting with the jury. (*Ibid.*) On appeal, the *Knighten* court held that the trial judge's procedure was in error, and noted any private

34.

communication between the judge and jury was improper. (*Ibid.*) The appellate court determined that a defendant and his attorney must be permitted to participate in decisions as to what testimony is to be reread to the jury. (*Ibid.*)

Here, unlike in *Bradford* and *Knighten*, a court reporter memorialized the trial court's brief interaction with the jury; as such, we are able to review the scope and potential impact of the contact. Unlike in *Dagnino* and *Knighten*, all counsel received notice of the jury's note, including both the question posed and the request for readback. Unlike in *Bradford*, the trial judge was not present with the jury while it deliberated, the judge did not offer further verbal instructions, and the judge did not respond to questions from jurors. Also, in *Bradford*, the judge did not provide information or discuss issues with the jury that went beyond the scope of the jury's note. (*Bradford, supra,* 154 Cal.App.4th at p. 1414.) Further, unlike in *Bradford*, the judge did not discuss any issues with the jury that exceeded the scope of the notice originally given to counsel. Finally, unlike in *Bradford*, defense counsel were each given notice and an opportunity to evaluate the jury's request, and to raise objections or suggest a different reply more favorable to the defense. Randle's authorities are distinguishable.[24]

Appellants provide no persuasive authority establishing the trial court erred. Based on this record, the trial court did not abuse its discretion regarding the jury's

---

[24]    Randle also cites *United States v. Nickell* (9th Cir. 1989) 883 F.2d 824 and *United States v. Ponce* (9th Cir. 1995) 51 F.3d 820, for the proposition a trial judge does not abuse its discretion when ordering readback to include excerpts from both the direct and cross-examination. However, *Nickell* and *Ponce* neither analyze California law nor hold a federal trial judge must provide cross-examination during readback, only to avoid giving undue emphasis to particular testimony. (*Nickell, supra,* 883 F.2d at p. 829; *Ponce, supra,* 51 F.3d at p. 833.) We further note neither *Nickell* nor *Ponce* are binding on this court. (*People v. Avena* (1996) 13 Cal.4th 394, 431.)

35.

request for readback.[25]  (*People v. Cooks*, *supra*, 141 Cal. App. 3d at p. 261 [the trial court has discretion to determine what testimony satisfies the jury's request].)

### 2. The trial court's written supplemental instruction was not in error.

Both Blount and Randle contend the jury was confused or puzzled regarding the legal instructions, and with proper notice counsel could have assisted in the process of determining the source of the jury's confusion.  Randle further argues the trial court should have questioned the jury on this issue given its "ambiguous" request.  They both assert the trial court did not do enough to assist the jury and the presence of counsel was critical.

The court, however, notified all counsel regarding the jury's request for further instruction.  The record does not establish any counsel objected or offered input regarding how the trial court should respond other than authorizing the court to respond in writing.  When the court reconvened with the parties, the court read its written response and no objection was lodged to the substance of the response.  As such, we reject Blount's and Randle's respective arguments that their counsel were not "properly notified" of the jury's request for clarification or an injustice occurred because counsel was not permitted to give input.

Further, despite appellants' arguments to the contrary, nothing from the jury's note indicated it was confused.  The jury was not prohibited from asking the court more questions if it so needed and it is speculative to presume otherwise.  (*Beardslee, supra,* 53 Cal.3d at p. 98.)

None of the appellants argue the jury instructions were less than "full and complete" for count 2.  Because these jury instructions were full and complete, the trial

---

[25]   Because the trial court did not abuse its discretion in this regard, we will not address appellants' various contentions the trial court's actions were prejudicial.

court had the discretion to reiterate them. (*Beardslee, supra,* 53 Cal.3d at p. 97; *People v. Montero, supra,* 155 Cal.App.4th at p. 1179.) By responding to the jury's note and advising them to focus on CALCRIM No. 1400, the trial court did not figuratively throw up its hands and tell the jury it could not help, as Blount contends. The court provided the jury with the complete information it needed without appearing as an advocate, either endorsing or redirecting the jury. (*Montero, supra,* at p. 1180.) Under the circumstances, the trial court did not abuse its discretion when it responded to the jury's note and directed them to reread CALCRIM No. 1400.

### 3. Appellants cannot establish prejudice from the scope of readback or the supplemental instruction given to the jury.

Even if error occurred regarding the scope of readback or the supplemental instruction, appellants cannot establish prejudice. They contend count 2 must be reversed under a *Chapman* analysis, and Jackson and Randle further argue count 1 should also be reversed. These arguments are unpersuasive.

As discussed earlier, this was not a close case regarding appellants' guilt in count 1 due to the evidence linking Blount to the crime scene, the three males observed in Blount's vehicle just before the crime, the location of appellants when apprehended just after the crime, and Andrews's unequivocal trial identifications. Further, as discussed earlier, the evidence was overwhelming regarding the appellants' guilt in count 2 as active participants with the Country Boy Crips. Although the jury did not hear Holcombe's cross-examination during the readback, the jury heard this testimony at trial and rejected it. It is beyond a reasonable doubt any error associated with the readback of testimony or the supplemental instruction was harmless.

### 4. The ex parte meeting by itself does not require reversal.

Blount asserts the judge's ex parte communication with the jury requires reversal, citing *United States v. United States Gypsum Co.* (1978) 438 U.S. 422 (*Gypsum*); *United*

*States v. Collins* (2nd Cir. 2012) 665 F.3d 454 (*Collins*); and *People v. Stewart* (1983) 145 Cal.App.3d 967 (*Stewart*). These authorities are unpersuasive.

In *Gypsum, supra,* 438 U.S. 422, the jury began deliberations after nearly five months of testimony. On the morning of the seventh day of deliberations, following apparent disagreements and confusion among the jurors, the foreman asked to meet with the judge to discuss the jury's condition and get guidance. (*Id.* at p. 460.) The judge met with counsel and suggested he should meet with the foreman alone, and counsel agreed. The judge met with the foreman, who made several references the jury was deadlocked. The judge made an impression on the foreman that he wanted a verdict "'one way or the other.'" (*Ibid.*) After the meeting, the judge summarized a report to counsel, which did not reference either of these two issues.

On appeal, the *Gypsum* court found reversible error because the trial judge exposed himself to a conversation which caused unintended and misleading impressions of his personal views without the presence of counsel to challenge his statements. (*Gypsum, supra,* 438 U.S. at p. 460.) In addition, the judge's communication to the jury panel went through the foreman, which risked innocent misstatements of the law and misinterpretations. Finally, the absence of counsel from the meeting, and the unavailability of a transcript, prevented counsel an opportunity to clear up confusion regarding the judge's direction to the foreman. (*Id.* at p. 461.) *Gypsum* emphasized it was not simply the ex parte meeting with the foreman which constituted error, but the fact the discussion was allowed to drift into a supplemental instruction to the foreman without counsel present to correct any mistaken impression. (*Id.* at p. 462.)

In *Collins, supra,* 665 F.3d 454, the trial judge had an ex parte meeting with a juror after receiving a note indicating this juror was involved in a hostile exchange with another juror the day before. The judge informed counsel of his intention to talk to the juror, but failed to disclose the contents of the note. (*Id.* at p. 458.) During his meeting

with this juror, the judge stated his displeasure over the juror's reported conduct. (*Ibid.*) On appeal, the *Collins* court determined the judge made statements to the juror that amounted to a supplemental instruction, and it found reversible error because the court failed to disclose the contents of the note to the defendant and counsel before meeting with the juror. (*Id.* at p. 462.)

Here, unlike in both *Collins* and *Gypsum*, the trial judge did not provide any supplemental instruction to the jury without counsel's authorization. Also, unlike in *Gypsum*, the judge did not engage in a conversation with any member of the jury panel which might have caused unintended and misleading impressions of his personal views. (*Gypsum, supra,* 438 U.S. at p. 460.) To the contrary, the judge refrained from questioning the jury or offering any opinions. Further, unlike in *Gypsum*, the judge spoke to the entire jury panel and not through a single source, which could have caused further miscommunication. Finally, unlike in *Gypsum*, a full transcript exists regarding the judge's interaction with the jury, and the trial court accurately summarized to counsel his exchange with the jury.

*Gypsum* and *Collins* are inapposite because the judge's interaction with the jury did not drift into supplemental instruction. *Gypsum* and *Collins* do not dictate reversal of the instant case even though counsel did not receive notice of the judge's plan to meet with the jury.

Finally, in *Stewart, supra,* 145 Cal.App.3d 967, the judge received a note from the deliberating jury requesting a reread of certain jury instructions and a preference for a written copy. The judge delivered the requested instructions to the jury without advising counsel. (*Id.* at p. 972.) The *Stewart* court held it was error for the judge to communicate with the jury without the presence of counsel, noting the court violated section 1138. (*Stewart, supra,* at p. 972.) Reversal was not required, however, because the appellate court found the error harmless. (*Id.* at pp. 973-974.)

Here, unlike in *Stewart,* the trial judge gave notice to counsel regarding the jury's request for further instruction.  Unlike in *Stewart*, the judge did not violate section 1138. *Stewart* is distinguishable and does not require reversal.

### 5. Although the trial court erred by not obtaining appellants' personal waivers, appellants cannot establish prejudice.

Randle concedes he did not have a constitutional right to be personally present during the actual readback of testimony.  (*People v. Ayala* (2000) 23 Cal.4th 225, 288 [a readback of testimony is not a critical stage].)   He contends, however, he had a personal right to be present when the judge met with the jury, which was not waived despite his counsel's consent that the court could respond to the jury in writing.  Blount makes a similar argument, asserting a defendant's presence may be required when the judge communicates with a deliberating jury.

A defendant has the constitutional right to be present at any stage which bears "a reasonable and substantial relationship to his ability to defend the charges against him." (*People v. Davis* (2005) 36 Cal.4th 510, 531 (*Davis*).)  A critical stage exists when the trial judge meets with the jury to provide instruction.  (*Bradford, supra,* 154 Cal.App.4th at p. 1410.)  In California, defendants also have a statutory right under section 977 to be present when the judge meets with the jury.  (§ 977, subd. (b)(1); see also *People v. Avila* (2006) 38 Cal.4th 491, 598 (*Avila*) [violation of § 977 occurred where felony defendant was absent from readback of testimony without written waiver].)

Here, appellants had both a statutory and constitutional right to be personally present when the trial court met with the jury.  This record does not demonstrate appellants gave personal waivers regarding those rights.  This was error.  (*Avila, supra,* 38 Cal.4th at p. 598; *Davis, supra,* 36 Cal.4th at p. 531.)

Appellants, however, cannot establish prejudice.  The constitutional error requires analysis under *Chapman* while the error under section 977 is state law and is reversible

under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Davis, supra,* 36 Cal.4th at pp. 532-533.) None of the appellants offer any argument establishing how their respective presence would have impacted their ability to defend against the charges. Indeed, it is difficult to imagine how appellants' personal presence during the trial court's brief meeting with the jury would have changed the outcome of this trial. The court's failure to notify appellants personally about his ex parte meeting is of no consequence, especially because all defense counsel received notice of the jury's note and failed to provide input. It is beyond a reasonable doubt this error was harmless and appellants are not entitled to reversal under either *Chapman, supra,* 386 U.S. at page 24, or *Watson, supra,* 46 Cal.2d at page 836.

## V.  The Trial Court Did Not Prejudicially Err In Declining To Accept Or Requiring The Prosecution To Accept Blount's Proposed Stipulation.

Blount contends the trial court committed reversible error when it declined to accept, or require the prosecution to accept, a proffered stipulation from Blount that the Country Boy Crips was a criminal street gang. Randle and Jackson join in Blount's claim without offering any additional legal authority or contentions. Blount further asserts his trial counsel rendered ineffective assistance if this issue is deemed waived or forfeited on appeal.

### A.  Background.

The amended information alleged as to count 1, that appellants committed the burglary for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The information also charged appellants in count 2 with active participation in a criminal street gang (§ 186.22, subd. (a)).

Before trial, Blount's defense counsel offered to stipulate that the Country Boy Crips was a criminal street gang within the meaning of section 186.22, subdivision (a). The proposed stipulation was that the gang engages, and has engaged, in a pattern of

41.

criminal behavior, including enumerated crimes listed in the statute. The prosecutor indicated he would not enter into a stipulation to the existence of the gang or a pattern of criminal activity.

The court asked if the stipulation would include that appellants were active participants in a criminal street gang, and all defense counsel declined to include that addition. Blount's counsel indicated the prosecution would still have to prove appellants were active participants on the date of the offense and they did the offense for the benefit of a gang. The trial court noted the following:

> "Based on that representation, counsel, under 352, it does not appear to the Court that a substantial amount of time would be saved in piecemealing that particular evidence to this jury. The Court recognizes that even if [the] defense was willing to stipulate that Country Boy Crips is a criminal street gang, that they do exist with the necessary elements and requirements under 186.22, and that the defendants themselves are active participants in the criminal street gang, that still would require the necessity of a gang expert testifying to his reasons and beliefs, his training and experience, as well as the hypothetical typically associated with direct examination of a gang expert.

> "It does not appear to the Court that a partial -- what this court would view would be a partial stipulation for the sole purpose of only stipulating to the predicate offenses and that a criminal street gang exists would not save substantial time for this court, nor for this jury in hearing the gang evidence that will be presented otherwise. For those reasons, the Court is not inclined to entertain the stipulation -- proposed stipulation any further, nor are the People required to accept it.

> "Recognizing under 352, as the Court has already balanced in some form or another, the gang evidence in this case, the Court is not going to require the People to agree to that stipulation because it does not do much more than save an insignificant amount of time in this court's view, and, more importantly, the jury would still hear evidence substantially similar to the predicate offenses necessary under the gang expert's training and experience, as well as the gang expert still testifying as to reasons why he believes the defendants are members or active participants in the criminal street gang.

42.

"For those reasons, the stipulation will be set aside and not entertained by the Court since there is not an agreement between the parties as a whole . . . ."

## B. Standard of review.

### 1. Section 186.22.

Section 186.22 is part of the California Street Terrorism Enforcement and Prevention Act of 1988, which defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal" that has as one of its "primary activities" the commission of one or more statutorily enumerated criminal offenses and which its members engage in a "pattern of criminal gang activity." (§ 186.22, subd. (f); accord, *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) The trier of fact may consider both the past conduct of gang members and the circumstances of the present or charged offenses to determine the group's primary activities. (*Sengpadychith, supra,* at p. 323.) A "pattern of criminal gang activity" requires a showing that the gang committed, or attempted to commit, two or more enumerated crimes on separate occasions, or by two or more persons. (§ 186.22, subd. (e).)

Section 186.22, subdivision (a), reads as follows: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

Section 186.22, subdivision (b)(1), adds a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."

### 2.     Stipulations.

An appellate court applies an abuse of discretion standard to review a trial court's ruling on the admissibility of evidence.  (*Waidla, supra,* 22 Cal.4th at p. 724.)  "'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal … is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]"  (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329.)

"'The general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness.' [Citation.]"  (*People v. Chism* (2014) 58 Cal.4th 1266, 1307.)  A trial court is not authorized to enforce a stipulation over the prosecutor's objection.  (*People v. Rogers* (2013) 57 Cal.4th 296, 329 (*Rogers*).)  "'[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.'"  (*Id.* at p. 330.)

### C.     Analysis.

Appellants' proposed stipulation would have avoided admission of the predicate offenses and primary activities necessary to establish the Country Boy Crips as a criminal street gang.  (§ 186.22, subds. (e) & (f).)  The proposed stipulation, however, would have still required proof appellants: (1) actively participated in a criminal street gang; (2) knew that members of the gang engaged in a pattern of criminal gang activity; and (3) willfully promoted, furthered, or assisted in felonious criminal conduct by members of the gang. (§ 186.22, subd. (a).)  In addition, evidence was still required to establish the burglary was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist criminal conduct by gang members.  (§ 186.22, subd. (b).)

After learning the proposed stipulation failed to include that appellants were each an active participant in a criminal street gang, and the prosecution would still have to prove they did the offense for the benefit of a gang, the trial court determined the proposed "partial stipulation" would not save a significant amount of time. The court noted the jury would still hear evidence necessary for the gang expert's training, experience and opinion, as well as the reasons why the expert believed appellants were active participants in a gang. The court balanced the competing interests under Evidence Code section 352. Based on this record, the court did not exercise its discretion arbitrarily, capriciously, or in a patently absurd manner when it considered the merits of the proposed stipulation and declined to force the prosecutor to accept it.

Blount, however, principally relies on *People v. Sherren* (1979) 89 Cal.App.3d 752 (*Sherren*), disapproved on other grounds in *People v. Bouzas* (1991) 53 Cal.3d 467, 478; *People v. Hall* (1980) 28 Cal.3d 143 (*Hall*), overruled by Proposition 8 as stated in *People v. Valentine* (1986) 42 Cal.3d 170, 181; *People v. Washington* (1979) 95 Cal.App.3d 488 (*Washington*); *People v. Anderson* (1978) 20 Cal.3d 647 (*Anderson*); and *Old Chief v. United States* (1997) 519 U.S. 172 (*Old Chief*), to establish the trial court abused its discretion and was required to accept the stipulation. This reliance is misplaced.

*Hall, supra,* 28 Cal.3d 143 and *Sherren, supra,* 89 Cal.App.3d 752, were decided prior to the adoption of Proposition 8 and required a prosecutor to accept an offer if a defendant admitted the existence of an element of a charged offense. (*Hall, supra,* 28 Cal.3d at p. 152; *Sherren, supra,* 89 Cal.App.3d at p. 755.) Both of these cases dealt with prosecutions of a felon in possession of a firearm under former section 12021.[26] (*Hall, supra,* at p. 147; *Sherren, supra,* at p. 755.) These cases held in a prosecution under

---

[26] Section 12021 was repealed operative January 1, 2012 and replaced by section 29800. (Stats 2010, ch. 711, § 6 (SB 1080).)

45.

former section 12021 the element of a prior felony conviction could not be given to the jury if the defendant stipulated to that fact. (*Hall, supra,* at p. 156; *Sherren, supra,* at p. 760.) However, Proposition 8 abrogated these holdings when it required, in part, a prior felony conviction to be proven in open court when it is an element of any felony offense. (Cal. Const., art. I, § 28, subd. (f); see also *People v. Cunningham* (2001) 25 Cal.4th 926, 984.)

Here, Blount contends the rationale in *Hall* should apply and require the prosecution to accept a defense stipulation if it involves a fact of consequence to the case. This argument is unpersuasive given abrogation of *Hall*'s holding and in light of current Supreme Court authority that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness. (*People v. Chism, supra,* 58 Cal.4th at p. 1307.) Moreover, the Supreme Court has noted a trial court is not authorized to enforce a stipulation over the prosecutor's objection. (*Rogers, supra,* 57 Cal.4th at p. 329.) *Hall* and *Sherren* do not establish error in the present matter.

In *Washington, supra,* 95 Cal.App.3d 488, the defendant was convicted of selling heroin in violation of Health and Safety Code section 11352. The defendant offered to stipulate he was familiar with heroin, and how it is packaged and sold. His proposed stipulation would have prevented evidence showing his previous and unrelated narcotic activity as proof he knew the nature of heroin. The defendant, however, refused to stipulate regarding his knowledge of the contents of the balloon at issue in the case. (*Washington, supra,* 95 Cal.App.3d at p. 490.) The trial court rejected the stipulation believing the defendant was required to stipulate his knowledge of the substance involved in the present charges. The prosecutor thereafter admitted the defendant's prior conviction for possession of heroin, and testimony from an officer regarding indications

46.

of the defendant's drug usage, including track marks and scars on the defendant's arms, and certain admissions from the defendant of his past use. (*Id.* at pp. 490-491.)

On appeal, it was determined the trial court failed to exercise its discretion when it erroneously believed the defendant was required to admit knowledge of the narcotic nature of the substance in the prosecution. (*Washington, supra,* 95 Cal.App.3d at pp. 491-492.) Beyond the trial court's failure to exercise its discretion, the appellate court determined the stipulation would not have impaired the prosecution's case and subjected the defendant to improper and unnecessary prejudice. (*Id.* at p. 492.) *Washington* reversed because the appellate court was unable to declare the error harmless under *Watson*. (*Ibid.*)

Here, unlike in *Washington*, the trial court exercised its discretion and considered the merits of the proposed stipulation. This factor alone makes *Washington* distinguishable. Moreover, unlike in *Washington*, which dealt with a single defendant and a single charge, the proposed stipulation here eliminated very little testimony of a prejudicial nature and saved little time as compared to the remaining gang evidence necessary under section 186.22, subdivisions (a) and (b). *Washington* is inapposite and does not require reversal.

In *Anderson, supra,* 20 Cal.3d 647, the two defendants were convicted of voluntary manslaughter. The trial court permitted the prosecution to introduce evidence the two defendants had twice been previously arrested together on unspecified charges. (*Id.* at p. 650.) On appeal, the *Anderson* court reversed after it determined an abuse of discretion occurred when the trial court overruled the defendants' objection to this evidence under Evidence Code section 352. (*Anderson, supra,* at p. 650.)

Here, *Anderson* is of no consequence to the present discussion as it did not deal with a proposed stipulation. Moreover, unlike in *Anderson*, which dealt with exclusion of the defendants' past criminal conduct, the proposed stipulation here still required the

47.

prosecution to introduce evidence of appellants' criminal histories as it related to proving section 186.22, subdivisions (a) and (b). *Anderson* does not require reversal.

Finally, in *Old Chief, supra,* 519 U.S. 172, the United States Supreme Court held a criminal defendant could stipulate to the existence of a felony conviction when charged with the federal equivalent of felon in possession of a firearm. *Old Chief* determined a defendant's offer to stipulate to an element of a crime is relevant evidence that must be factored into a district court's analysis under rule 403 of the Federal Rules of Evidence. (*Old Chief, supra,* at pp. 184-185.) The *Old Chief* court reviewed the commentaries and notes accompanying rule 403, and determined they permitted a court to assess evidentiary alternatives when considering whether to exclude evidence on the grounds of unfair prejudice. (*Old Chief, supra,* at pp. 183-184.)

Here, the trial court complied with the requirements of *Old Chief* when it factored appellants' proposed stipulation into its analysis of prejudice. Blount, however, cites to *Old Chief* and contends the trial court "should have discounted the probative value of the prior conviction evidence based on the proposed stipulation and then weighed that discounted value against the considerable prejudice the defendant would have suffered from the disclosure of the facts underlying the earlier conviction." *Old Chief*, however, makes no such pronouncement and does not require reversal of the instant matter.

### 1. Appellants cannot establish prejudice.

Even if the trial court erred in failing to accept the proposed stipulation, appellants cannot establish prejudice. Blount asserts the evidence of the gang's history and details of its past crimes was prejudicial because it likely caused the jurors to "assume a criminal propensity" against appellants. He contends the proposed stipulation would have avoided admission of highly prejudicial evidence without appreciably reducing the forcefulness or persuasiveness of the prosecution's case. Appellants argue the prejudicial effect requires reversal under a *Watson* standard. These contentions have no merit.

48.

Holcombe testified about the history of the Country Boy Crips gang, how its members establish themselves, and the importance of gang members knowing about the crimes committed by other members. He explained and discussed the "primary activities" of the Country Boy Crips, opined the gang was engaged in an ongoing pattern of criminal conduct, and discussed two predicate offense cases involving known Country Boy Crips gang members (not appellants) who were arrested for residential burglary and possession of narcotics for sale, respectively. This testimony covered approximately 15 pages in the record and fell under the proposed stipulation.

In contrast, Holcombe testified in detail regarding each of the appellants' relevant criminal and gang histories, including review of a predicate offense (possession of a weapon) involving Randle. The testimony about appellants' criminal backgrounds covered approximately 49 pages in the record. The proposed stipulation eliminated very little testimony of a prejudicial nature as compared to the remaining gang evidence relevant under section 186.22, subdivisions (a) and (b). In light of the detailed evidence regarding appellants' gang and criminal activities, it is not reasonably probable a result more favorable would have occurred had the trial court forced the prosecutor to accept the stipulation. A miscarriage of justice did not occur requiring reversal.

## VI.  Sufficient Evidence Supports Blount's Conviction Of Count 2.

Blount argues there was insufficient evidence to support his conviction in count 2 for promoting felony street gang conduct (§ 186.22, subd. (a)). He contends no evidence establishes he was an active participant in any group other than the Watts/Lotus Country Boy Crips, and the prosecution failed to establish a link between the Country Boy Crips and the Watts/Lotus Country Boy Crips.[27]

---

[27]  Blount's opening brief refers to the gang as the "Countryside Boy Crips."

## A. Standard of review.

To determine if sufficient evidence supports a verdict, an appellate court reviews the entire record in the light most favorable to the judgment to determine whether substantial evidence exists—that is evidence which is reasonable, credible, and of solid value—from which a reasonable juror could find the defendant guilty beyond a reasonable doubt. (*People v. Jones* (2013) 57 Cal.4th 899, 960.) The relevant question is not whether the appellate court believes the evidence at trial established guilt beyond a reasonable doubt; rather, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) The appellate court is to presume the existence of every fact the jury could have reasonably deduced from the evidence in support of the judgment. (*Clark, supra,* 52 Cal.4th at p. 943.)

## B. Analysis.

The prosecution established Blount was an active participant of the Country Boy Crips as of the date of the Lopez burglary. Blount provides no citation to the record establishing he was a member of any other gang. As such, this argument is deemed waived based on a failure to support it with a necessary citation to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743 [failure to cite to record waives claim].)

In any event, based on Holcombe's testimony and his review of Blount's tattoos, arrest records, street checks and booking statements, substantial evidence supported the jury's conviction of Blount of count 2. This evidence was reasonable, credible, and of

solid value such that a reasonable jury could find Blount guilty beyond a reasonable doubt.[28] (*People v. Jones, supra,* 57 Cal.4th at p. 960.)

## VII. Randle's Gang Admission Was Not Inadmissible Under *Miranda*.

Randle argues the trial court erred when it permitted testimony he made an admission of gang membership to Bakersfield Police Officer Peter Beagley. Randle was 17 years old at the time of the encounter. Beagley recognized two of the other individuals as members of the Country Boy Crips.

Randle was seated on a curb between the patrol vehicle and the suspects' vehicle. Without reading Randle his *Miranda* rights, Beagley asked him if he was a member of the Country Boy Crips and Randle indicated he was. Randle was not handcuffed during the encounter, but he was not free to leave because he was being detained. The stop lasted approximately 24 minutes and Randle was not arrested.

Randle's defense counsel objected to Beagley's testimony under *Miranda*. The court overruled Randle's objection subject to a motion to strike.

Following the conclusion of Beagley's testimony, and outside the presence of the jury, the court placed the following on the record:

> "[THE COURT:] Regarding the last running objection as it related to Mr. Randle and whether there was any *Miranda* violation, the Court does find at this time, based on the testimony, that Mr. Randle was not in custody. He was being temporarily detained, and he was subsequently released.
>
> "By virtue of Mr. Randle not being in custody and only being temporarily detained for law enforcement to conduct an investigation, the Court does not find that *Miranda* was necessary nor required in that

---

**28** Because substantial evidence exists to establish Blount was an active participant of the Country Boy Crips, we will not address his unsupported argument he was actually a member of the Watts/Lotus Country Boy Crips and the prosecution failed to show the "necessary ongoing connection" between its members and any other gang.

contact; and, therefore, Mr. Randle's statement to Officer Beagley will stand."

## B. Standard of review.

*Miranda* applies only to "custodial interrogation," which is questioning initiated by law enforcement officers after "'""a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'"" [Citation.]" (*Ochoa, supra,* 19 Cal.4th 353, 401.) *Miranda* is not involved if a "custodial interrogation" is lacking. (*Ibid.*)

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citations.]" (*Stansbury v. California* (1994) 511 U.S. 318, 322; *California v. Beheler* (1983) 463 U.S. 1121, 1125.) The initial determination of custody depends on the objective circumstances of the interrogation, and not the subjective views of either the interrogating officers or the person detained. (*Stansbury v. California, supra,* at p. 323.)

An appellate court independently reviews the uncontradicted facts to determine whether the trial court rendered a proper legal conclusion. (*People v. Stansbury* (1995) 9 Cal.4th 824, 831.)

## C. Analysis.

Randle argues a reasonable person in his position would not have believed he was free to leave under the totality of the circumstances. He asserts the trial court erred in failing to suppress his gang admission to Beagley.

In *Berkemer v. McCarty* (1984) 468 U.S. 420 (*Berkemer*) the officer stopped the defendant after observing his vehicle weaving on the highway. The officer determined the defendant was drunk, and decided to charge him with a traffic offense. (*Id.* at p. 423.) The officer, however, did not tell the defendant he would be taken into custody, and had

him perform a field sobriety test, which the defendant failed. The officer asked the defendant whether he had been using intoxicants, and the defendant admitted he had recently consumed two beers and smoked marijuana. The officer placed the defendant under arrest and transported him to jail. (*Ibid.*)

The *Berkemer* court found nothing in the record indicating *Miranda* warnings should have been given at any time prior to the defendant being placed under arrest. (*Berkemer, supra,* 468 U.S. at p. 441.) The defendant failed to establish he was subjected to restraints comparable with a formal arrest and the initial stop of his vehicle, by itself, did not render the defendant "'in custody.'" (*Ibid.*) *Berkemer* noted the time between the stop and the arrest was short, and at no point during that interval was the defendant told his detention would not be temporary. (*Id.* at pp. 441-442.) The officer never communicated his intention to arrest the defendant even though he apparently decided he would do so as soon as the defendant exited his vehicle. *Berkemer* held the officer's unarticulated plan was not relevant in deciding whether the suspect was in custody because the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. (*Id.* at p. 442.)

The Supreme Court also found no custodial interrogation based on other aspects of the officer's interaction with the defendant. A single police officer asked the defendant "a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists." (*Berkemer, supra,* 468 U.S. at p. 442.) *Berkemer* held the interaction could not be characterized as the functional equivalent of formal arrest and concluded the defendant was not taken into custody for purpose of *Miranda* until the officer arrested him. Accordingly, the defendant's statements made prior to the arrest were admissible against him. (*Ibid.*)

Here, like in *Berkemer*, Randle was never placed under arrest, told he would be arrested, or had his freedom restrained to a degree associated with a formal arrest.

53.

(*Berkemer, supra,* 468 U.S. at pp. 441-442; accord, *Stansbury v. California, supra,* 511 U.S. at p. 322.) Similar to *Berkemer*, a single officer asked Randle one question. Like in *Berkemer*, Randle's detention was brief and nothing in this record establishes Randle was informed he would be detained for a lengthy period of time. This record does not demonstrate Beagley ever intended to arrest Randle. Accordingly, under these facts, Randle was not taken into custody for purposes of *Miranda*. (*Berkemer, supra,* 468 U.S. at p. 442.) Consequently, the statement Randle made to Beagley was admissible. (*Ibid.*)

Randle, however, contends Beagley knew the individuals in the vehicle to be documented gang members. He argues Beagley was not conducting a *Terry*-stop[29] to investigate suspicious circumstances but was instead effecting a "targeted detention" to obtain incriminating information. He asserts the traffic stop in which Beagley detained and questioned him was "not the sort of exigent investigatory detention" which the Supreme Court described in *Berkemer*. He contends a reasonable person in his position would not have believed he was free to leave.

Randle, however, does not assert Beagley lacked probable cause to detain the vehicle or that the detention was unreasonable. A brief detention by law enforcement is not the equivalent of a formal arrest. (*Cervantez v. J. C. Penney Co.* (1979) 24 Cal.3d 579, 591, fn. 5; *People v. Soun* (1995) 34 Cal.App.4th 1499, 1517.) "*Miranda* warnings are not required during the course of a brief detention unless the suspect is placed under restraints normally associated with a formal arrest." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1404.)

Beagley's subjective intent or plan is not relevant to whether *Miranda* warnings were required. Instead, the inquiry is how a reasonable person in Randle's position would have understood his situation. (*Berkemer, supra,* 468 U.S. at p. 442; *People v.*

---

[29] *Terry v. Ohio* (1968) 392 U.S. 1.

*Carpenter* (1997) 15 Cal.4th 312, 384 [fact interrogating officers suspected the defendant had committed a crime did not render interrogation custodial], superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.) As discussed above, a reasonable person in Randle's position, even a 17 year old, would not have understood he was either under arrest, going to be arrested, or would be detained for a lengthy period of time. The trial court did not err because *Miranda* warnings were not required.

### 1.    Randle cannot establish prejudice.

Even if the trial court had erred in admitting Randle's statement to Beagley, the error was harmless beyond a reasonable doubt. As discussed in section II.C.1.c, *ante*, the evidence was substantial regarding Randle's gang participation.

Randle, however, contends Beagley's testimony was the "only instance where the jury did not receive an instruction that limited the purposes for which it could consider the testimony." He argues his admission to Beagley allowed the jury to consider the officer's testimony in an unlimited fashion.

This argument is unpersuasive. The trial court instructed the jury pursuant to CALCRIM No. 1403 that all evidence of gang activity could only be considered for the limited purpose of deciding whether the particular defendant "acted with the intent, purpose, and knowledge that are required to prove the gang-related crime and enhancement . . . ." It is presumed the jury followed the trial court's limiting instruction. (*Waidla, supra,* 22 Cal.4th at p. 725.)

Randle further argues the defense extensively challenged the records Holcombe used for his opinion, and those records were not reliable and lacked credibility. He maintains the jury had reservations about the accuracy of Holcombe's testimony because it rejected the gang enhancement.

55.

These contentions lack merit because it was the jury's role to weigh the sufficiency of the circumstantial evidence and determine the facts. (CALJIC Nos. 1.00, 2.01.) In finding the gang enhancement not true, it is apparent the jury carefully weighed the evidence and did not ascribe to all of Holcombe's opinion testimony. However, the jury determined the evidence was sufficient to find appellants' guilty of count 2 and overwhelming evidence existed that Randle was an active participant of the Country Boy Crips. In light of the entire record, it is beyond a reasonable doubt Randle's gang admission to Beagley was harmless.

## DISPOSITION

The judgments are affirmed.


_____
LEVY, J.

WE CONCUR:


_____
HILL, P.J.


_____
GOMES, J.